Matter of Daniel G. v Marie H. (2021 NY Slip Op 04178)





Matter of Daniel G. v Marie H.


2021 NY Slip Op 04178


Decided on July 1, 2021


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered:July 1, 2021

532332
[*1]In the Matter of Daniel G., Respondent,
v
Marie H., Appellant. Attorney for the Child, Appellant. (And Another Related Proceeding.)

Calendar Date:June 1, 2021

Before:Egan Jr., J.P., Lynch, Clark, Pritzker and Colangelo, JJ.

Clea Weiss, Ithaca, for Marie H., appellant.
Donna C. Chin, New York City, attorney for the child, appellant.
Schlather, Stumbar, Parks & Salk, LLP, Ithaca (Mark A. Schlecter of counsel), for respondent.
Lisa K. Miller, McGraw, attorney for the child.



Pritzker, J.
Appeal from an order of the Family Court of Tompkins County (Cassidy, J.), entered October 27, 2020, which, among other things, granted petitioner's application, in a proceeding pursuant to Family Ct Act article 6, to modify a prior order of custody.
Petitioner (hereinafter the father) and respondent (hereinafter the mother) are the parents of two children — a daughter (born in 2003) and a son (born in 2005) — both of whom have been diagnosed with autism. The parties' relationship deteriorated, resulting in a 2010 judgment of divorce and separation agreement, pursuant to which the parties agreed to share joint custody of the children. In 2013, the father filed a petition to modify the custody arrangement, which resulted in the parties entering an order upon consent in June 2014. Pursuant to the 2014 consent order, the parties agreed to share joint custody of the children and equal parenting time, but the father was awarded final decision-making authority "regarding all major matters affecting the welfare of the children, including, but not limited to, matter[s] of health, education and religion." Up until this point, both parties had been living in the City of Ithaca, Tompkins County. The father later remarried, and, in 2015, he moved to Chelmsford, Massachusetts with his wife (hereinafter the wife). In August 2016, after allegedly experiencing difficulties in school in Ithaca, the daughter agreed to move to Massachusetts to reside with the father and the wife. The son has continuously lived with the mother in Ithaca.
In November 2019, the father filed an order to show cause and petition to modify the parties' prior custody order to grant him sole custody of the children. The father alleged that the mother provided the son inadequate attention and guidance and noted that the Tompkins County Department of Social Services (hereinafter DSS) was notified of a report regarding concerns about possible maltreatment of the son. The father also asserted that the mother's living environment is harmful to the son. In June 2020, the father filed a second order to show cause following the mother's failure to answer, further asserting that his concerns regarding the instability of the mother's living situation for the son had only grown more urgent with the COVID-19 pandemic. The father also alleged that, without his consent, the mother transferred the son from Lehman Alternative Community School (hereinafter LACS) to Ithaca High School (hereinafter IHS) — both of which are in the Ithaca City School District (hereinafter ICSD). In July 2020, the mother answered the father's petition and filed a petition seeking to modify the prior order of custody by granting her decision-making authority as to the son's education so that the mother could enroll him at IHS. The father answered the mother's petition. Family Court ordered a child protective investigation pursuant to Family Ct Act § 1034, and DSS reported to the court that both parties' homes meet [*2]the minimal standard of care for the children's safety.
A four-day hearing on the petitions was held in August and September 2020, and Family Court thereafter conducted Lincoln hearings with both children. The father, the mother, the attorney for the child (hereinafter AFC) for the son and the AFC for the daughter submitted written summations to the court. In October 2020, Family Court granted the father's petition, awarding the parents, as relevant here, joint custody of the son, with primary physical custody of the son to the father and specific parenting time to the mother. The court also awarded the father final decision-making authority but directed him to confer with the mother on "every major decision affecting the children." The son's AFC and the mother appeal.[FN1]
The mother and the son's AFC contend that Family Court's decision to modify custody and permit relocation is not supported by a sound and substantial basis in the record. Initially, as the parents agreed in the 2014 consent order that either parent could file a modification petition "without a showing of a material change in circumstances," neither parent was required to satisfy that threshold burden (see Matter of Mauro NN. v Michelle NN., 172 AD3d 1493, 1494 [2019]; Matter of Rosenkrans v Rosenkrans, 154 AD3d 1123, 1124 [2017]). Moreover, although the father had joint physical custody of the son, at the time he filed the instant petition, the son had been solely residing with the mother since the father's move to Massachusetts in 2015, making him effectively the noncustodial parent. Thus, the father's petition is not solely a relocation petition. "Instead, the question is whether modification of the custodial arrangement is warranted and, inasmuch as the practical effect of granting the father's request for modification of custody would be relocation of the child[], relocation must be considered within that framework" (Matter of Adam OO. v Jessica QQ., 176 AD3d 1418, 1419 [2019] [internal quotation marks, brackets and citations omitted]; see Matter of Bodrato v Biggs, 274 AD2d 694, 695 [2000]).
"In determining the best interests of the child, courts must consider, among other factors, the quality of the parents' respective home environments, each parent's past performance and ability to provide for the child's physical, mental, emotional and intellectual needs and the willingness of each parent to foster a positive relationship between the child and the other parent" (Matter of Richard EE. v Mandy FF., 189 AD3d 1992, 1993 [2020] [citations omitted]; see Matter of Clayton J. v Kay-Lyne K., 185 AD3d 1243, 1244 [2020]). In the context of a proposed relocation, the best interests analysis includes a consideration of "a variety of factors, including each parent's reasons for seeking or opposing the move, the quality of the relationships between the child[] and the custodial and noncustodial parents, the impact of the move on the quantity and quality of the child['s] future [*3]contact with the noncustodial parent, the degree to which the custodial parent's and the child['s] lives may be enhanced economically, emotionally and educationally by the move and the feasibility of preserving the relationship between the noncustodial parent and the child[] through suitable custodial period arrangements" (Matter of William V. v Bridgett W., 182 AD3d 636, 638 [2020] [citation omitted]; see Matter of Tropea v Tropea, 87 NY2d 727, 740-741 [1996]). Furthermore, the preference of a child of advanced age as to who to live with is entitled to great weight (see Matter of Anthony YY. v Emily ZZ., 189 AD3d 1924, 1925 [2020]; Matter of Battin v Battin, 130 AD3d 1265, 1266 [2015]).
At trial, the father testified that both the son and the daughter have been diagnosed as being on the autism spectrum. In 2013, he became concerned with the mother's parenting after he found that she had left the daughter home alone and the home was "overgrown" and cluttered. Despite this concern, after filing a modification petition in late 2013, the parties entered into the 2014 consent order, which continued shared physical custody. Not long thereafter, the father and the wife relocated to Massachusetts to improve his financial circumstances and the children continued to live with the mother. In 2016, the daughter moved to Massachusetts. The father's testimony indicates that both children have expressed to him that they miss the other's household. The father also expressed concern for the mother's living arrangement, explaining that the mother's home is cluttered, although he admitted that he had not been inside the home recently. The father stated that, in 2019, the mother ran into financial trouble and the father helped her pay her mortgage.[FN2] The father's testimony indicates that he learned that the mother did not have a working hot water heater in October 2019. Ultimately, the father testified that he believes the son would have a more stable environment living with him, and, because the father lives near Boston, Massachusetts, the father believes that the son will have better access to doctors, specialists and therapists to address his anxiety. The father testified that he pays the mother child support,[FN3] buys clothing and food for the children and covers their health care costs, while the mother pays for the children's cell phones. Notably, the father confirmed that he made a risk determination and decided not to have the son travel to Massachusetts during the summer of 2020 in light of the COVID-19 pandemic. In fact, at the time of trial in late August/early September 2020, the father had not seen the son since the 2019 holiday season.
As to the son's current schooling in Ithaca, the father concedes that the son has informed him that he wants to go to IHS. The father's testimony indicates that he learned through an individual employed by LACS,[FN4] who at one point served as the son's speech and language pathologist, that the son was no longer [*4]going to be attending LACS and was transferring to IHS. The father testified that he does not want the son to transfer schools and adds that the transfer was never discussed with him. Despite this testimony, the father confirmed that the son never actually transferred from LACS to IHS. The father is concerned about the son attending IHS because it is a larger school and a different community than LACS. However, the father also testified that, after having heard the other testimony at the fact-finding hearing, he felt "assured" that the son's individualized education program (hereinafter IEP) could properly be transferred to IHS. In the father's view, the son has difficulty with changes and the father is concerned that transferring the son's school from LACS to IHS would have a detrimental effect on him. As for the son's prospective schooling in Massachusetts, the father averred that the son would be able to take part in a program designed for students with emotional disabilities and challenges. The father confirmed that the IEP available to the son in Ithaca and the one in Massachusetts are "very similar as far as structure"; however, in Massachusetts, the schools prepare the children for postsecondary education one year earlier than in Ithaca. The father believes that the school program for the son in Massachusetts is more thorough. He further indicated that, in Massachusetts, the son would have better access to certain summer camps, which are designed for children with autism, and the son would be afforded counseling and social interaction with his peers. The father characterized himself as an active parent and averred that he helps the children with their homework, attends school events and IEP meetings.
The wife testified that she has a positive relationship with the daughter and that she and the father share responsibilities relative to the son's care. The wife added that the father is close with the son and, when the two are not together, they communicate via text. The wife detailed that the son and the daughter take care of each other and the daughter "looks out for" the son. The wife's mother testified that she is a pediatrician and lives approximately five minutes away from the father and the wife. The wife's mother stated that the father and the son work well together, and the father is interactive with the son. The father did not present any other witnesses.
The mother called several witnesses at the hearing, including the director of special education at ICSD. The director testified about the services that IHS provides to students and averred that the son's IEP at LACS could be transferred to IHS, and that once he was a student at IHS, the parties could call any time and request a review meeting with the school's committee on special education. To that end, the director explained that the committee on special education can develop a special education plan for a student, and, in the event that the son has needs in excess [*5]of what the committee decides could be met by IHS, the school would look into other options to meet those needs. Although the director confirmed that she has never met the son and does not know his family, she testified that, for a child on the autism spectrum who is verbal, IHS can provide co-teaching or consultant teaching in the classroom and that IHS provides its students a curriculum that offers social and emotional counseling. According to the director, IHS collects and compiles statistics to track the effectiveness of its special education programs, and the director averred that IHS is "performing generally better than average" in that regard.
A special education teacher who is employed by ICSD testified that the son was on her caseload at LACS. The teacher describes the son as a "savant in his own way," adding that he has a difficult time with quick transitions and social cues and would sometimes have meltdowns and become upset. However, the teacher continued to describe that the son is a "a great student when he . . . was able to engage," and he "could almost teach the class on [a] subject . . ., because he had so much knowledge about it . . . he was so knowledgeable about so much." The teacher explained that she has met the mother on several occasions and believes that the mother is "very concerned about [the son] and how he was doing in school." The teacher said that she spoke with the father on the phone and he likewise seemed to be a caring parent. The teacher explained the resources and support provided to the son at LACS and opined that LACS is "suited to [the son] and his needs," although she added that more structure may help him. The teacher said that a transfer from LACS to IHS would be hard for the son — as would any big change in general — but added that IHS has a resource room with small special education classes and "intense" 30-minute sessions in which students work toward goals with the hope of transferring their learned skills into larger classrooms. Despite her earlier testimony, the teacher later opined that the son's transfer to IHS could be beneficial to him because it would offer him more structure, and added that, although the son may miss LACS, he could deal with IHS once he became acclimated with the structure therein and would "go[] with it." The teacher testified that a child's preference is "[a]bsolutely" considered in determining whether a child would be successful in a certain program.
A senior caseworker from Child Protective Services at DSS also testified. According to the caseworker, the mother had an issue with clutter in her home and "getting . . . infrastructure in place, like hot water," as well as securing a functional washer, dryer and vehicle. The caseworker explained that she made a number of referrals for the mother and discussed with her access to mental health services. The caseworker's testimony confirms that she conducted a Family Ct Act § 1034 investigation in this matter and [*6]issued a report in November 2019. The caseworker confirmed that she ultimately found that both parties' homes met the minimal standard of care for the safety of the children. The caseworker testified that the mother had several cats within her home and there was a "faint" smell of urine therein. She described that there were three cars outside the home that the son works on as a hobby. The caseworker confirmed that by the time the case was closed, there was space for the son and the mother to sit in the living room, the kitchen was clean and the son's bedroom was functional. Ultimately, the caseworker denied that the son was in an immediate health and safety risk inside the mother's home. The caseworker testified that, although the mother's home did not have a functioning water heater, the mother heated water on the stove for the son to bathe and the mother had "fresh water" for cooking and for the toilets to function, which is deemed adequate in terms of the laws of this state. Additionally, the caseworker informed Family Court that the son was sleeping in the same bed with the mother and that the son did not like the fact that he did not have access to a car while living with the mother and that the mother's home was cluttered.
The mother testified that the son has primarily lived with her since the father moved to Massachusetts in 2015. The mother described the son as "happy-go-lucky," "intelligent" and "excited" to share the information he learns, but explained that the son also gets frustrated when he makes a mistake or does not understand something immediately. She continued that the son has recently become more motivated about his schoolwork, and she added that the son helps her around the house. The mother's testimony confirms that, among other things, she takes the son to a free science workshop after school twice per week and takes him swimming and on walks. The mother confirmed that she continues to sleep in the same bed with the son even though he is nearly 15 years old, and explained that she has encouraged him to sleep in his own bed; however, the mother testified that the son views it as a punishment and "[i]t seems to be he is less stressed if we co-sleep."
As to the son's schooling, the mother explained that the son has attended LACS for the past four years. However, the mother viewed the son's enrollment there as "temporary" and always hoped he would one day transfer to IHS "when he was ready and it would be his choice." According to the mother, the son told her that he wanted to attend IHS before the COVID-19 pandemic and that, when a survey about the family's intentions for the next school year was presented to her, she indicated that the son wanted to attend IHS and that she was thinking of transferring the son there. The mother averred that she never submitted any official paperwork to effectuate a transfer of schools, and she confirmed that she had not yet spoken to the father about it. The mother's testimony [*7]indicates that she spoke with the individual employed by LACS, who informed the father about the pending transfer, and the mother asked her what the next steps would be to transfer the son, at which point the individual informed her that someone would contact her. However, no one has done so and the mother has not taken any further steps in effectuating a transfer. The mother went on to testify that the survey was informal and that she did not believe that she was "circumventing [the father's] decision-making." The mother testified that, since the COVID-19 pandemic, the son has been learning remotely at home. The mother further testified that the son has a set distance learning schedule and wakes himself up on time for school and writes out his schedule. The mother averred that she provides the son with the encouragement that he needs while learning remotely, and she explained that she ensures he is on track by asking him questions about his assignments and checking his email.
The mother indicated that since June 2020, she has been working at a company that sells reused fabric and sewing machines and that, in previous years, she has had to withdraw money from her retirement accounts and has only $200 remaining in the account. The mother admitted that her home lacks storage and that she has been shy about having people over because of how "messy it is." The mother also admitted that it took her a while to remedy the hot water heater issue, but that she eventually withdrew money from her retirement account and used it to install a new hot water heater. The mother averred that she would have remedied the situation sooner if she had known the situation was bothering the son but that he did not express a preference for showers rather than the baths she drew for him using water heated on the stove. The mother testified that she considers herself to have situational depression and explained that she has paperwork for both her and the son to receive services from Tompkins County Mental Health Services. She also testified that she now has a car and has accumulated enough money to pay her taxes and her bills.
Ultimately, the mother expressed concern about the son relocating to Massachusetts because she is currently able to focus on the son's needs in a one-on-one capacity, and at the father's house there are multiple people, which may be difficult for the son. The mother expressed a concern that the father would be too authoritative and further expressed her fear that the son will not be able to make choices for himself while living with the father. The mother did, however, confirm that she believes it is important for the children to grow up together. The mother stated that, if the son does not relocate to Massachusetts, she would like him to attend IHS. She added that, were it not for the pandemic, she believes the son should be attending IHS because "he's asking to be challenged." The mother confirmed that, although the son's transfer to [*8]IHS would be an adjustment, she sees the potential transfer as a benefit to him because it will increase his social interaction with others.
Although a very close call, we agree with the mother and the son's AFC that Family Court's determination that it was in the best interests of the child to change custody and permit the father to relocate the son to Massachusetts is not supported by a sound and substantial basis in the record. At the outset, we would be remiss not to indicate that it is evident from the testimony as a whole that both parents love their children and want nothing but the best for them. It is abundantly clear that both parents have ensured that the children are, in view of their autism diagnoses, appropriately educated and that any increased needs are met. The parents agree that their communication regarding the children could use some work, but this does not appear to have negatively impacted the children much, if at all. Further, although there is a significant financial disparity between the respective households, it is evident that neither household lacks love or stability.
That said, it is clear that the son is very strongly bonded to the mother.[FN5] Indeed, he has lived with the mother for the last six years since the father moved to Massachusetts, except for short periods of visitation with the father. Moreover, the son has had very little visitation with the father since the 2019 holiday season due largely to the COVID-19 pandemic. Additionally, although the father cites the living conditions at the mother's home as the motivation for initially seeking custody, we find this questionable given that he testified that the condition of the mother's home has long been problematic and that, despite this, he relocated to Massachusetts and left both children in her care. Although the issues with the hot water heater were no doubt problematic, that matter was remedied prior to trial. Even more troubling, however, is the father's strong opposition to the son changing schools because the son has difficulty with change, yet he feels it is in the son's best interests to relocate him to Massachusetts away from the mother and the life he has established with her. Although relocation would certainly enhance the son's life, as his living conditions would improve due to the father being more financially secure, this is only one factor in our analysis (see generally Matter of Tropea v Tropea, 87 NY2d at 740-741; Matter of William V. v Bridgett W., 182 AD3d at 638). Finally, although not dispositive, given the advanced age of the son, as well as testimony regarding how intelligent he is, we find that Family Court did not give proper weight to his wishes (see Matter of Anthony YY. v Emily ZZ., 189 AD3d at 1925; Matter of Battin v Battin, 130 AD3d at 1266). Accordingly, the father's modification petition is dismissed.
Finally, we turn to the mother's argument that, if the son continues to reside primarily with her, she should be [*9]awarded final decision-making authority for him as requested in her petition. Until the issue of the son transferring to IHS, it appears as though the mother and the father have had little disagreement as to major decisions regarding the children. Although the father alleged that the mother transferred the son to IHS without consultation with him, evidence at the hearing established that the mother was merely seeking information and that the transfer did not actually occur. Certainly, there is no dispute that the mother should have consulted the father at the outset, as both parties should do for any major decisions regarding the children. Despite this, the testimony at the hearing established that IHS is comparable to LACS and demonstrated that the son's desire to attend IHS may assist with a successful transition. We also found the testimony of the son's special education teacher compelling that a transfer to IHS could be beneficial to the son. In light of this, we grant the mother's petition and award her final decision-making authority as to the son's education as it relates to a transfer to IHS, although she must discuss any decisions with the father prior to making any changes.
Egan Jr., J.P., Lynch, Clark and Colangelo, JJ., concur.
ORDERED that the order is reversed, on the law, without costs, petitioner's application dismissed and respondent's application granted.



Footnotes

Footnote 1: This Court granted a stay of Family Court's decision pending this appeal (2020 NY Slip Op 75279[U]).

Footnote 2: On cross-examination, the father admitted that any mortgage payments he made for the mother's residence were deducted from future child support payments.

Footnote 3: The father's testimony confirms that, following the increase in his annual salary as a result of his job in Massachusetts, the father has not communicated with the mother about the possibility of him paying her more in child support for the son.

Footnote 4: This individual did not testify at the fact-finding hearing.

Footnote 5: We agree with the mother and the son's AFC that Family Court unduly focused on the issue of the mother and the son sleeping in the same bed. The mother's testimony made clear that she is trying to deter this behavior, despite it having a calming effect on her son.