Matter of Tamara XX. v William YY. (2021 NY Slip Op 06577)





Matter of Tamara XX. v William YY.


2021 NY Slip Op 06577


Decided on November 24, 2021


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered:November 24, 2021

528931
[*1]In the Matter of Tamara XX., Appellant,
v
William YY. et al., Respondents. (Proceeding No. 1.)
In the Matter of Kim ZZ., Respondent,
v
Tamara XX., Appellant, and William YY. et al., Respondents. (Proceeding No. 2.)

Calendar Date:October 12, 2021

Before:Garry, P.J., Lynch, Aarons, Pritzker and Reynolds Fitzgerald, JJ.

Law Offices of Dunning & Krupka, Ilion (Christine G. Krupka of counsel), for appellant.
Lisa A. Burgess, Indian Lake, for William YY., respondent.
Louis P. Winner, New York City, for Kim ZZ., respondent.
Franklin County Department of Social Services, Malone (Nicole M. DuvÉ of counsel), for Franklin County Department of Social Services, respondent.
Reginald H. Bedell, Willsboro, attorney for the child.



Pritzker, J.
Appeal from an order of the Family Court of Franklin County (Champagne, J.), entered March 25, 2019, which, among other things, granted petitioner's application, in proceeding No. 2 pursuant to Family Ct Act article 6, for custody of the subject child.
Nicole ZZ. (hereinafter the mother) and respondent William YY. (hereinafter the father) are the parents of the subject child (born in 2012). In 2016, the mother was granted sole custody of the child at the conclusion of a Family Ct Act article 10 proceeding. In 2017, the mother had a child with her boyfriend (hereinafter the boyfriend); at the time, the mother, the boyfriend, the child and the child's half brother were residing with the parents of the boyfriend, respondents Jeffrey A. and Lynn A. (hereinafter the boyfriend's parents). In 2018, the mother died unexpectedly and, thereafter, the father was incarcerated.[FN1] In the interim, the child and her half brother were placed with the boyfriend's parents. Because the child did not have a guardian, Tamara XX. (hereinafter the paternal grandmother) filed a petition seeking custody of the child (proceeding No. 1), and petitioner Kim ZZ. (hereinafter the maternal grandfather) filed a pro se guardianship petition, which was subsequently dismissed and replaced with a custody petition (proceeding No. 2). The petitions were joined for a fact-finding hearing.
After the fact-finding hearing and a Lincoln hearing, Family Court found that both the maternal grandfather and the paternal grandmother met their burden of establishing the existence of extraordinary circumstances [FN2] and that it was in the child's best interests for the maternal grandfather to have sole legal custody and be granted primary physical placement; the court acknowledged that such placement would require relocation of the child to Kentucky. The court ordered that the paternal grandmother be given certain visitation and that the father would receive supervised visitation. The paternal grandmother appeals.
The paternal grandmother contends that Family Court erred by determining that it was in the child's best interests to grant the maternal grandfather custody of the child. "In determining the best interests of the child, courts must consider, among other factors, the quality of the parents' respective home environments, each parent's past performance and ability to provide for the child's physical, mental, emotional and intellectual needs and the willingness of each parent to foster a positive relationship between the child and the other parent" (Matter of Richard EE. v Mandy FF., 189 AD3d 1992, 1993 [2020] [citations omitted]; see Matter of Clayton J. v Kay—Lyne K., 185 AD3d 1243, 1244 [2020]). Moreover, although not a traditional relocation case,[FN3] because granting the maternal grandfather's petition means that the child will move to Kentucky, we must consider that a best interests analysis, in the context of a proposed relocation, "includes a consideration of a variety of factors[*2], including each [grand]parent's reasons for seeking or opposing the move, the quality of the relationships between the child and the custodial and noncustodial [grand]parents, the impact of the move on the quantity and quality of the child's future contact with the noncustodial [grand]parent, the degree to which the custodial [grand]parent's and the child's lives may be enhanced economically, emotionally and educationally by the move and feasibility of preserving the relationship between the noncustodial [grand]parent and the child through suitable custodial period arrangements" (Matter of Daniel G. v Marie H., 196 AD3d 801, 803-804 [2021] [internal quotation marks, brackets and citations omitted]; see Matter of William V. v Bridgett W., 182 AD3d 636, 638 [2020]). "Inasmuch as Family Court is in a superior position to evaluate witness credibility, [this Court] [will] defer to its factual findings and only assess whether its determination is supported by a sound and substantial basis in the record" (Matter of Damian R. v Lydia S., 182 AD3d 650, 651 [2020] [internal quotation marks and citation omitted]; see Matter of Seltzer v Patterson, 193 AD3d 1057, 1058 [2021]).
As indicated by Family Court, custody with either the paternal grandmother or the maternal grandfather would require that the child relocate as the paternal grandmother lives in a different part of New York than the boyfriend's parents, where the child was residing at the time of the fact-finding hearing, and the maternal grandfather resides in Kentucky. The court also indicated that both the paternal grandmother and the maternal grandfather are in good health, have suitable homes,[FN4] are financially stable and have the means to provide the child with opportunities for extracurricular activities. Testimony at the fact-finding hearing established that the paternal grandmother has been involved in the child's life since the time she was born and has exercised court-ordered visitation whenever possible. The paternal grandmother lives with her fiancÉ in a home that he owns and has family nearby. As Family Court pointed out, the record is devoid of any information about the fiancÉ's relationship with the child or his position on having the child reside in his home. The paternal grandmother testified that, if granted custody, she would foster a relationship between the child and her half brother and that she would permit the child to travel to Kentucky to see the maternal grandfather. The paternal grandmother also testified that she works two part-time jobs and that she has not yet figured out a child care situation for the child while she is working. Although the paternal grandmother testified regarding her desire to facilitate visitation between the child and the father, when questioned regarding the father's extensive criminal history and instances of domestic violence against the mother, the paternal grandmother averred that she was not aware of these things.
The maternal grandfather [*3]testified that he lives in Louisville, Kentucky with his wife and that he has lived there since 1994. He recalled that he and his wife visited the child on a few occasions prior to the mother's death and that he has visited the child on approximately eight occasions since the mother passed away. The maternal grandfather stated that the child has not been to Kentucky but that he had attempted to have her visit. The maternal grandfather asserted that he is currently employed and that his wife [FN5] would be caring for the child after school and that, if she was unable to, the child would go to an after school program at the YMCA. He testified that, although he does not wish to facilitate a relationship between the father and the child due to domestic violence perpetrated by the father against the mother, he would abide by a court order to do so. He also confirmed that he would transport the child to New York for any court-ordered parenting time and that it was important for him to foster a relationship between the child and her half brother. The maternal grandfather testified to an incident that occurred during Thanksgiving when the child woke with a nightmare and, when he inquired as to what was wrong, the child reported that the paternal grandmother "told [her] she only had two options of where to live" and that "if [the child] went to live with [the maternal grandfather] in Kentucky, [the child] [would] never see [her] family again." According to the maternal grandfather, the child also informed him that the paternal grandmother told her that "daddy Gerry put too much heroin in the needle and gave it to mommy and killed mommy." The maternal grandfather confirmed that the child refers to her biological father as "daddy Bill" and to the mother's boyfriend as "daddy Gerry." During her testimony, the paternal grandmother denied telling the child these things.
Jeffrey A., with whom the child has been placed since the mother's death, testified on the maternal grandfather's behalf and averred that the maternal grandfather and the child have a good relationship. Jeffrey A. testified that the maternal grandfather had stayed at his home for an extended period of time to visit the child and that, during that time, the maternal grandfather was able to learn the child's schedule and routine. Jeffrey A. averred that he and the maternal grandfather have had discussions on how to facilitate visitation between the child and the half brother and that the maternal grandfather, who is also the grandfather of the half brother, has a strong desire to foster that relationship. When asked about communications with the paternal grandmother, who is not related to the half brother, Jeffrey A. explained that she has not communicated with him regarding fostering a relationship between the child and the half brother should she be granted custody of the child.
Family Court properly determined that the child's best interests would be served by placing her with the maternal [*4]grandfather in Kentucky. Although the separation of the child from the half brother is not ideal, the court appeared to be satisfied with the representations by the paternal grandfather, which were confirmed by testimony of Jeffrey A., that visits would be planned for the children to see one another (see e.g. Matter of Sweeney v Sweeney, 127 AD3d 1259, 1261 [2015]). Based upon the totality of the circumstances, "including the evidence relating to the past performance of [the paternal grandmother and the maternal grandfather], their respective abilities to provide for [the child's] emotional, physical and educational well-being, [the maternal grandfather's] willingness to foster a relationship between [the child] and [the half brother], and the need to maintain stability in the young child's life," Family Court's decision to grant custody of the child to the maternal grandfather is supported by a sound and substantial basis in the record (Matter of Melody J. v Clinton County Dept. of Social Servs., 72 AD3d 1359, 1362 [2010], lv denied 15 NY3d 703 [2010]; see Matter of Terry PP. v Domiyon PP., 184 AD3d 914, 916 [2020]; Matter of Marcus CC. v Erica BB., 107 AD3d 1243, 1247 [2013], lv dismissed 22 NY3d 911 [2013]).
The paternal grandmother's remaining contentions require little discussion. There is no merit to her assertion that Family Court erred in finding Franklin County to be the proper venue, despite Herkimer County having entered the initial custody order. To that end, Family Ct Act § 171 provides that "a lawful order of the [F]amily [C]ourt in any county may be enforced or modified in that county or in the [F]amily [C]ourt in any other county in which the party affected by the order resides or is found" (see Matter of Carter v Van Zile, 162 AD3d 1127, 1128 [2018]).[FN6] Thus, inasmuch as the mother was granted permission to move with the child to Franklin County in December 2016, and the child remained domiciled there until the time of the mother's passing, approximately two years thereafter, Franklin County is the appropriate venue (see Matter of Carter v Van Zile, 162 AD3d at 1128; compare Matter of Gabriella UU. [Kelly VV.], 83 AD3d 1306, 1308 [2011]). Finally, to the extent preserved, the paternal grandmother's contentions that the attorney for the child did not provide effective representation are not supported by the record. The paternal grandmother's remaining contentions have been examined and found to be without merit.
Garry, P.J., Lynch, Aarons and Reynolds Fitzgerald, JJ., concur.
ORDERED that the order is affirmed, without costs.



Footnotes

Footnote 1: The father was released to parole on December 4, 2018, after the petitions were filed but prior to the fact-finding hearing.

Footnote 2: The extraordinary circumstances determination is not at issue on appeal.

Footnote 3: At the time the maternal grandfather's petition was filed, the child was placed by the local social services agency with the boyfriend's parents, so there was no custodial parent per se.

Footnote 4: A concern was raised regarding firearms in the maternal grandfather's home, but testimony revealed that the firearms are properly secured and Family Court found that they are not a danger to the child.

Footnote 5: Testimony established that the maternal grandfather's wife has a good relationship with the child.

Footnote 6: The paternal grandmother's reliance on the Uniform Child Custody Jurisdiction and Enforcement Act is misplaced as that Act applies to interstate custody proceedings, rather than inter-county venue issues.